This morning's third argument is Appeal No. 22-1919, Amara v. Department of Justice. Mr. Granger, whenever you're ready. Good morning, Your Honors, and may it please the Court. My name is Raymond Granger, and I'm appearing on behalf of Petitioner Thomas Marra. Your Honors, if I may begin by taking a moment to lay out the scene at the dock that night. I think that would help put the problems with the agency's case and with the Board's decisions in perspective. Can I ask you kind of a preliminary question before you do that? Of course. Do you agree that your appeal focuses on alleged factual errors rather than legal errors? For the most part it does, Judge, although we do believe that, you know, the legal standards were violated. There's not substantial evidence for certain findings. We feel that the Douglas factors were not followed correctly. So, you know, maybe more considered mixed questions of law and fact. We do believe, importantly, Judge, with respect for factual arguments, this Court has made clear that the Board cannot simply denominate its findings in terms of credibility and then avoid inconsistencies in the record and have that finding, those credibility findings, insulated from review. Can I ask, as another preliminary, is it also correct, you're really only appealing the removal decision? You're not here asking us to vacate or reverse the two findings that your client engaged in conduct unbecoming and showed poor judgment, right? We are asking you to find that Charge 1, Specification 3 and Charge 2 were not proven. Right, but that would still leave your client having been found to have violated the first charge, correct? That's correct. We're not conceding Charge 1, Specifications 1 and 3 and Charge 2. You're not contesting those? Yes, Judge. Got you. Thank you. But in terms of the physical layout that I think will help put a lot of arguments in perspective and why we believe this Court should remand, in the appendix at page 662, I don't know if your Honors have that available, but if you do not, it's a place where you may start when you take this into consideration. There is a picture of the dock. It's not a nighttime picture, but it was entered into evidence as a fair and accurate representation of the scene that night. And, again, that's Appendix 662. And if I could just set the scene, Your Honor. If you start from the bottom of the picture cup, as you get past the beach to the left, you see what's referred to as the dinghy dock, which becomes important in the testimony of Captain Smith. Further up the dock you see a fence. That's to the left of that fence, where the fence is considered the gate, and to the far left is where it was opened. In front of that gate, closest to the left, closest to the water, was Keyshawn Serrano. Next to him, to the right, was Captain Smith. And next to him was a witness that the agency does not contest was a disinterested witness with no bias, and that was a security officer named Drew Powell. Farther down the dock, according to Mr. Smith's testimony, approximately 110 feet away, were two other crew members, Corey Kriger and Jocelyn Nolasco-Guerrero. I also want to make clear, Judge, that it's also clear from Mr. Smith's testimony, and I'll refer you to the appendix at 932-33. The ferry you see in the picture, that's not where the Red Hook One was. What Captain Smith describes quite explicitly is that his ferry was behind where this ferry is situated. And that's important because two of the crew members come running down from the end of the dock. So when you now take this scene, I want to point out that Mr. Smith made two extraordinary claims that he had never made before. He didn't make them to the Virgin Islands Police Department when he was interviewed the next day. He didn't make the claim to the Office of the Inspector General when he was interviewed four months later. And he did not make the claim in his own report that he filed the next day. And that was when Mr. Marra and his then co-worker, Mr. Wambacher, reached the dinghy dock. They started yelling racial slurs. Now, he had not only never said that before, but Ms. Powell, a disinterested witness, said, in fact, she didn't hear any racial slurs by Mr. Marra. Nobody ever says that Mr. Marra did not utter racial slurs. No witness has asked directly, hey, can you confirm that Mr. Marra never said any racial slurs, and they confirmed that, correct? Well, Mr. Marra testified that he did not. Other than your client. Well, but the only witness that the agency called was Captain Smith. Okay. Those witnesses would not? I'm talking about throughout the entire investigation. The Virgin Islands Police, the Department of Justice, I think it was, the deciding official. Nobody ever says, yes, I was there. I saw the whole thing. Mr. Marra never used a racial slur. Well, I don't recall anyone specifically asking that, either Virgin Islands Police Department or Office of the Inspector General. Could have been asked, right? You all could have asked it. The witnesses, they're not my witnesses, and they would not speak to us. The agency's got the burden. But we do have hearsay statements that I think address your concerns. Keyshawn Serrano, who was right at the dock, right at the opening, he told the Virgin Islands Police Department that Mr. Wambacher used racial slurs. Did the police ask Mr. Serrano whether Mr. Marra did? I don't know, but what they put in the report is that Mr. Serrano said it was Mr. Wambacher. He was interviewed four months later, and he said again. Isn't the bottom line here, this was tried in front of the board? The board heard the witnesses that were called by both sides and made a finding that your client, probably as well as the other individual, made racial slurs. And we review that very deferentially. You do, but you have made clear, Your Honor, there are limits. And what I'm saying is that the A.J.'s findings, she didn't even address our arguments. The board, in reviewing the administrative judge, didn't even address our arguments about the inconsistency of hearsay statements that the administrative judge relied on. She cited eight hearsay statements. So we'll look at the hearsay statements. Keyshawn Serrano tells the Virgin Islands Police Department the next day it was Wambacher. Nothing said about Mr. Marra. Four months later, he's interviewed by the Office of the Inspector General. It was Wambacher. He doesn't say it was Mr. Marra. I think that if he had heard Mr. Marra make the comment, he'd have said it. Mr. Krieger, interviewed by the Virgin Islands Police Department the next day, it was only Mr. Wambacher. He was interviewed by the Office of the Inspector General. It was only Mr. Wambacher. They all said only? I don't remember that. Well, what they said was Mr. Wambacher. For a conclusion, I think a common-sense reading of the record is when witnesses are telling law enforcement that someone used a racial slur, they're going to tell those law enforcement, those interviewers, if someone else used a racial slur. And this is a key point. And importantly, again, we have an eyewitness there, a security officer, who Mr. Smith vouched for. They've apparently known each other all their lives. And he stated in the record that he is so convinced of her credibility that his words, that he would believe something simply because she said it. And she said no. And, in fact, agency counsel at the hearing found it so incredible that— She said no. Can you expand on that? You just said she said no. Can you give me a little bit more context on what you're describing? As to Ms. Powell? You just said she said no, and I felt like it came out of the sky. I apologize. Can you just give me a little bit more context? She was asked if Mr. Mara had made any racial slurs. And to your point, she was asked at trial. And she said she didn't hear any racial slurs from Mr. Mara. She didn't hear any, but she didn't say he did not, right? She did not hear any. But she was not only no farther away from Mr. Smith, when Mr. Smith is saying for the first time that Mr. Wambacher and Mr. Mara are yelling from the end of the dock, she actually might have been closer. There's a portion of her testimony that indicates she may have actually been 10 feet closer to Mr. Mara and Mr. Wambacher. But the entire distance, at most, is about 40 or 45 feet. And I submit to Your Honor that that disinterested witness, if those racial slurs had been yelled by Mr. Mara from the end of the dock, she'd have heard it. And Mr. Serrano would have heard it. And Mr. Serrano would have told the Virgin Island Police Department. He would have told the Office of Inspector General. But they did not. What are you seeking for relief from this court? I'm sorry, Your Honor? What relief do you want from this court? Mitigation of penalty. A remand for mitigation of penalty. That's what we're looking for here, Judge. And I think that the agency's case, I mean, they only called one fact witness. And I think that their case falls with that one fact witness because the hearsay statements in the record completely belie Mr. Smith on this point. And another important point, but just to give you the sites, Appendix 680 is Mr. Serrano's Virgin Island Police Department statement. 357 is his OIG statement. Mr. Krieger, his Virgin Island Police Department statement is at 682. His statement to OIG is at 356. Now, there was one other witness who claimed that he heard it too, and that was Jocelyn Barrero. But when he was interviewed the next day, he said no. He said it was only Mr. Wombacher. It was only four months later. And I would point out to you, Judge, that he is a crew member of Mr. Smith. His memory is certainly going to be a lot fresher as of the time he gets interviewed by the Virgin Island Police Department. And he, the next day, said it was Mr. Wombacher, and he didn't mention Mr. Marra. So there are a total of, and one other witness, there was an independent witness named Amber Smith who told the Office of Inspector General that it was only Mr. Wombacher. So you've got five witnesses. Did the deciding official already testify, I don't remember if it was he or she, that they would have given the same penalty of removal even if your client did not make any racial slurs? And he testified words to that effect, Your Honor, and I submit to you that that's not credible. And it's not credible because if you read the proposal, you read the decision letter, and then especially if you read the letter from the owner of the Farlock Ventures company that owned the ferry. This all started with a letter to the Attorney General of the Virgin Islands. The governor of the Virgin Islands was copied. The island's congressional representative was copied, several others, and, of course, OPR. It was the charge that made this an explosive case. So you need us to find that the folks who made the decision and said that's not the only basis on which I made the decision to remove and I would have made the same decision even if there were no racial slurs, we need to find that not credible. Well, I don't think you have to find it not credible in order to remand. I think you could still independently say that, especially if you believe there is substantial reason to doubt Captain Smith. There is sufficient reason here to remand for mitigation. And as far as Mr. Smith's credibility, I want to mention something else that I think shows he clearly was embellishing, clearly was exaggerating, and he was undercutting his own credibility. He claimed for the first time at the hearing that Mr. Wambacher had taken a knife or a box cutter and put it to his throat. He didn't say that to the Virgin Islands Police Department. What is your best legal support for why you should remand for mitigation of the penalty? Well, first of all, on the issues of the credibility determinations, I would have in the McGuffin v. Social Security Administration case where you've made it clear that the- that's cited in our brief at page 26. You've made it clear that the board can't insulate its credibility findings from reviews simply by calling them credibility findings. But as to the point about the other claim by Mr. Smith that a knife had been put in front of his neck in full view of everyone else, he never said that before, not to the police department, not to the Office of the Inspector General, and he didn't put it in his own report the next day. So my point is that I am- there's no doubt in my mind that having a gun pointed at him, which apparently happened after Mr. Marra fled the scene, after he got the- Mr. Granger, you're pretty deep in your rebuttal. Do you want to save it? Oh, I thought I had been at 20 on my main. I apologize. Okay. Thank you for saving me from myself. Sure, we'll save you two minutes. Good morning, Your Honors. May it please the Court. The appellant is attempting to relitigate credibility determinations and factual findings made by the fact finder below, which is virtually unreviewable by this Court unless he's able to show that those factual findings are inherently improbable or contradicted by undisputed fact, neither of which he has done here. Does it come down to the word of Captain Smith versus the word of Mr. Marra? No, Your Honor, I don't believe so. So if we look at the challenge to the physical altercation- Let's just focus on the racial slur matter. Yes, Your Honor. Because that's the only thing that was really explored in the opening argument. Yes, Your Honor. So Captain Smith does provide multiple statements as to what was said, but also Mr. Nolasco-Guerrero also was standing nearby and described the statements made by the appellant. Was he standing nearby? It's my understanding from the statements, Your Honor, that he was relatively near Captain Smith at the time. How near do you think that was? Was that 110 feet? No, Your Honor, I believe that that was Mr. Krieger and Mr. Serrano, who was further down the dock. Didn't it take Nolasco-Guerrero some months, though, before he tagged Mr. Marra as one who made racial slurs? I don't think that came up in the immediate day after the statement, did it? Your Honor, I believe that it was made to the OIG investigator. Which is not the day of or day after. It was not, Your Honor. However, there's been provided no evidence that Mr. Nolasco-Guerrero is not a reliable witness. He corroborates what Captain Smith says. Also, Amber Smith, who was at the ticket counter initially, reported that the appellant made vulgar comments. She didn't specify as to the nature of those. She didn't recall the specific language used, but she did recall him using vulgar language towards Captain Smith. A policy counsel said that Mr. Wambacher was the only one who made racial slurs, or used some type of paraphrase to that effect. Can you respond to that? Your Honor, I would disagree with that characterization. I don't believe that any of the witnesses state that he was the only one. There were several witnesses that did say that they heard Mr. Wambacher make those statements, but none of the witnesses said, I heard everything that was said on that dock, and I did not hear the appellant use racial slurs. So as the decision-maker, Chief Sedote, described in his testimony, there was a lot going on on the dock, and it would be surprising to him if everybody could have heard the entire conversation going on. A posing counsel brought up that Ms. Powell Charles said that she didn't hear anything and she was close by, except she testified that she had her back turned, she was engaging in other customers, giving security briefings. There was multiple times throughout the incident where she was calling 911, and so she didn't necessarily hear everything that was going on. Even that being said, even if Mr. Smith, or Captain Smith, was the only witness, that is sufficient to sustain this specification. The fact-finder determined and specifically stated they found Captain Smith to be credible. He provided a statement the very next day to Varlick Ventures, his employer. He then provided a statement to Virgin Island Police Department. He then provided a statement to OIG. He then testified at the hearing, and the administrative judge found that his testimony was credible and consistent. The appellant has not provided any evidence to show that Captain Smith's testimony is inherently improbable or contradicted by undisputed fact. The same goes for the physical altercation. The appellant challenges whether there was substantial evidence to support that charge. In that instance, there's at least four witnesses who have provided statements as to how the physical altercation transpired. Captain Smith describes the appellant pushing through the security gate into the secure area and pushing Captain Smith. Mr. Nolasco-Guerrero also describes the appellant shoving Captain Smith. Mr. Krieger and Mr. Serrano also see this pushing of Captain Smith and run to assist, trying to push him out of the secure area, and then the fistfight ensues. What did the administrative judge find that Mr. Marra did with respect to the physical altercation? I believe, Your Honor, the administrative judge found that he believed Captain Smith's testimony to be credible, that the appellant was the instigator of the physical altercation. I'm not sure that I saw an actual factual finding by the administrative judge as to what Mr. Marra did in connection with the physical altercation. Can you point to anywhere where the judge made a determination on that point? Your Honor, I don't have it in front of me. I don't believe that he specifically said, specifically articulated the sequence of how he saw the attack go down, but that he found that Mr. Smith's testimony on it was credible. You would say it's implied by finding Captain Smith's testimony credible that it's a finding that it happened the way Captain Smith said? That's how we should read it in your view? Yes, Your Honor. Substantial evidence in the record supports the finding that the appellant engaged in a physical altercation which amounted to conduct unbecoming of a U.S. Marshal, and the appellant has not pointed to evidence that make the testimony of these four witnesses inherently improbable or contradicted by undisputed fact. In regards to the issue of self-defense raised by the appellant, this was considered by the board, and the board found that the appellant failed in his burden to raise facts that amounted to self-defense, and the board properly determined that self-defense was not applicable in this case. Did the administrative judge fail to address Mr. Mars' self-defense claim? Your Honor, the administrative judge doesn't discuss his defense of self-defense in their opinion, so it's unclear as to what extent the administrative judge considered it. However, the administrative judge found that Captain Smith and the other witnesses' testimony to be credible, which contradicts the appellant's position that he was not the provoker. Even that being said, even if the court were to find that the administrative judge improperly didn't consider the self-defense, the self-defense was considered by the board, and the board determined that the appellant did not provide facts that supported self-defense. Hypothetically, if one were to credit Mr. Mara's own telling of events, would there be room for a self-defense, affirmative defense here? I know the board didn't credit Mr. Mara, but I'm wondering if even if you did, is self-defense still dispositive here? I believe that self-defense could go to whether it was reasonable, so it was probably more for mitigation, but that's not to say that the fact finder would not have substantiated the specification if they found that he was acting reasonably in his own self-defense. So I think the shorter answer, Your Honor, is that the government would say self-defense is an available defense to the appellant before the MSPB if he was able to prove it. But as I mentioned, the appellant failed to prove facts to support a self-defense in this case. Finally, the board considered all relevant factors when determining the penalty of removal was reasonable, including that the appellant was still greeting his spouse, the nature of this misconduct, the fact that this misconduct was within 17 months of other serious alcohol-related misconduct in which the appellant drove at three times the legal limit and crashed into a city bus. They considered his nine years of good service, the embarrassment that this incident brought upon the agency, and he also considered the penalty table and the fact that this was the first offense of conduct unbecoming. The decision is within the sole discretion of the administrative judge, and it's also virtually unreviewable by this court. An appellant has not raised any facts for the court not to give that deference. Unless the court has any other questions for the foregoing reasons, we ask the court to affirm the decision. Thank you. Mr. Granger, you have two minutes. Thank you, Your Honor. First of all, not a word from agency counsel about the new claims at the hearing by Captain Smith that there was yelling of racial slurs from the end of the dock. Not a word about the new claim not corroborated by anyone that Mr. Wambach had put a knife to his throat. So in answer to the question from Judge Chen, yeah, I think this really does come down to Captain Smith's testimony. As far as Mr. Nolasco-Guerrero, agency counsel is mistaken. At Appendix 943 to 944, Captain Smith says it was Serrano who was standing next to him, and that Mr. Nolasco-Guerrero, Mr. Critter, came running from, and the 110 feet that Judge Stark had invented in Appendix 932 to 933. So the captain makes it clear that Mr. Nolasco-Guerrero is down at the end of the dock, and it's not until December, four months later, that Mr. Nolasco-Guerrero, for the first time, makes a claim that Mr. Manor had made a racial slur. Amber Smith, yeah, she's ambiguous in her statement to the Virginia Police Department. She hears vulgarities. She hears all sorts of things. When she's interviewed by OAG, she says Mr. Wambach. And again, I submit to you, Your Honors, that it's common sense. If someone is going to make a point of saying a racial slur was used and they identify one person, they're going to say if the other person did. That may be common sense, but isn't your burden to show us that what the board said to the contrary is not common sense? Multiple interpretations are available. I appreciate the question. Our agency counsel says that the credibility determinations are virtually unagreeable. That's not the standard. If there's a case where the objective evidence in the record, these hearsay statements, which the agency chose to rely on. The agency had access to these witnesses. The agency didn't call them. Five witnesses contradict their only witness, their only fact witness. I see I'm running out of time. Your Honors, I would just add with respect to the self-defense claim, if nothing else, it's part of the Douglas analysis. Provocation by another party is something that the court can consider, and I think there's plenty on this record to amend for mitigation of penalty. Thank you for your time. Thank you very much. The case is submitted.